IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>VANCE INOUYE,<br><br>Defendant. | ) | CR. NO. 09-00115 SOM<br><br>**ORDER REGARDING RESTITUTION CONDITION; EXHIBIT A** |

**ORDER REGARDING RESTITUTION CONDITION**

## I. INTRODUCTION

On October 30, 2014, this court, finding that Defendant Vance Inouye had lied to his Probation Officer about restitution payments, revoked supervised release and sentenced Inouye to one day in custody, followed by fifty-nine months of further supervised release. Inouye's original supervision term had been scheduled to expire in a few months, and the new supervision term was designed to allow the Probation Office to continue to monitor his substantial restitution obligation.

Inouye's sole objection to the revocation sentence was to the restitution condition. The Government joined in the objection. This court then announced that, because no party would be defending its restitution condition in the event of an appeal, the court would be filing a detailed written order concerning that condition.

As the court understands it, the parties object to the inclusion in the revocation sentence of any installment payment schedule for Inouye's restitution obligation. They argue that the court should have refrained from setting any schedule and should instead have waited until Inouye, who is unemployed, obtained a job and made more permanent living arrangements before ordering any particular payment. The court is required by 18 U.S.C. § 3664 to specify "the schedule according to which, the restitution is to paid, in consideration of . . . projected earnings and other income of the defendant." This court, reviewing Inouye's recent earnings history, his living circumstances, his undisputed employability, and the priority of his restitution obligation over his other debts, concluded that there was sufficient information in the record to allow it to project Inouye's income and to make an individualized determination as to what installment payments he should be ordered to make, subject, of course, to adjustment as future developments might warrant.

The parties' joint objection raises a question: If it is improper for the court to project Inouye's earnings based on the financial data before the court, when, if ever, may the court project a defendant's earnings? Pressed on this point, the parties identified no circumstance that would allow a court to project income.

## II. BACKGROUND OF THE CASE

Beginning around 2008 and continuing over the next few years, the Government filed a number of cases in the District of Hawaii alleging mortgage fraud. Inouye's case was one such action; it related to a case, Criminal No. 09-00057, involving more notorious Defendants, John and Julie Anne Baludueza Dimitrion. The Dimitrions have been fugitives since they failed to appear at their sentencing hearing on July 6, 2010.

Inouye was a loan officer with a mortgage brokerage owned by the Dimitrions. He was charged with having conspired to commit wire, mail, and mortgage fraud, and with having actually committed wire fraud involving over $200,000. His conduct, as described in his Presentence Investigation Report, included having his wife offer to serve as a "straw buyer" of the home of individuals in financial straits. The individuals were told that they could continue to live in their home and later buy the home back. Inouye's wife submitted a loan application containing false statements in connection with her purchase of the home. After title to the home was conveyed to her, she obtained a $100,000 home equity loan, then doubled the limit on that loan and borrowed the maximum amount. In the meantime, the original homeowners were being told that they had to vacate the property, which they refused to do. Civil litigation against Inouye ensued, as did this criminal action.

Inouye pled guilty to both charges with a plea agreement and was sentenced to one month of imprisonment, followed by supervised release that included 120 days of intermittent confinement. The judgment included a requirement that he pay restitution of $274,401, which included $74,401 payable to the original homeowners, owed jointly and severally by Inouye and the Dimitrions, and $200,000 owed by Inouye alone to the home equity lender. Because the Dimitrions have absconded, the joint and several portion of the restitution amount is being collected from Inouye alone. The restitution condition required that "[a]ny remaining balance upon release from confinement be paid during the period of supervision on an installment basis according to the collection policy of the Probation Office but at a rate of not less than 10 percent of his monthly gross income."

The Probation Office's collection policy referred to in Inouye's judgment had been adopted by the court in an order signed by the active district judges years before Inouye was sentenced.

Inouye's term of supervised release began on May 3, 2010. By now, the supervised release term on the conspiracy count has expired, and the supervised release term on the wire fraud count is scheduled to expire in about half a year.

Because his restitution payments were irregular, the Probation Office arranged for payments to be made by payroll

deduction through Inouye's employer beginning in June 2011. The payroll deduction amount was 25 percent of his net pay, pursuant to the Probation Office's collection policy, which had graduated percentages beginning at 10 percent but increasing as income increased.

Inouye's employer and income changed over time. For some periods between July 2013 and May 2014, he earned considerably more than $2000, for others about $2000 per month. For some months, he was paying $700 or more per month in restitution, while for other months, he paid $500 per month in restitution. Beginning in November 2013, when payroll deduction appears to have ended, he stopped making payments. When questioned by his Probation Officer, he claimed more than once to have mailed in payments, but no payments were received.

The Probation Officer brought the matter to the court's attention, and the court issued a summons requiring Inouye to appear to show cause why supervised release should not be revoked.

The revocation proceeding caused the Federal Public Defender's Office, the United States Attorney's Office, and the court to focus on the restitution schedule. In the meantime, the court, taking into account financial difficulties Inouye was encountering, excused him for several months from making additional payments.

## III. BACKGROUND REGARDING RESTITUTION CONDITION

Over the course of several hearings and meetings, the court participated in detailed discussions of the District of Hawaii's restitution practices. This discussion was not confined to what was occurring in Inouye's case, instead expanding to encompass a review of the District's longstanding restitution practices.

Because the Federal Public Defender, who was representing Inouye, had very specific concerns about the District's practices, this judge asked the Federal Public Defender for a written statement of the issues he had identified. A copy of that statement is included in the record at ECF No. 54. Citing United States v. Gunning, 339 F.3d 948 (9th Cir. 2003); United States v. Gunning, 401 F.3d 1145 (9th Cir. 2005); United States v. Lemoine, 546 F.3d 1042 (9th Cir. 2008); and Ward v. Chavez, (678 F.3d 1042 (9th Cir. 2012), the Federal Public Defender's statement challenged the court's longstanding restitution payment practice as involving the delegation by the court to the Probation Office of the court's nondelegable duty to set a restitution payment schedule.

The merits of that statement are not in issue here, but the court mentions it because it provides part of the context in which Inouye's revocation sentencing proceeded. The Federal Public Defender's statement did not mention that a decade ago,

the Ninth Circuit rejected a similar challenge to this District's practice. The Federal Public Defender may have felt prohibited from referring to that ruling because it was embodied in an unpublished (and thus nonprecedential) memorandum issued before the effective date of Rule 32.1 of the Federal Rules of Appellate Procedure, which provided that unpublished rulings could be cited. This court does not mention the unpublished ruling as authority for any matter in controversy here, but only as factual background (and therefore as arguably permitted under Ninth Circuit Rule 36-3(c)(ii)).

The unpublished ruling in issue is United States v. Estacion, 86 Fed. Appx. 320 (9th Cir. 2004), in which the Ninth Circuit said:

> Relying upon United States v. Gunning, 339 F.3d 948, 950 (9th Cir. 2003) (per curiam), Estacion contends that the district court plainly erred by delegating to the probation office the responsibility of determining the manner and schedule of her restitution payments. We reject this contention because we conclude that the district court's order did not assign full control of this determination to the probation office. Cf. id. (remanding because the district court assigned "full control" of the restitution payment schedule to a probation officer).

Id. at 320.

This judge shared the Federal Public Defender's statement with the United States Attorney's Office, with the other judges on the District Court bench, and with the Probation

Office. A series of meetings and discussions followed, some occurring among only the judges, some with judges and the Probation Office, some between attorneys and the Probation Office, and some that included some judges, the Probation Office, the Federal Public Defender, and the United States Attorney's Office. These meetings and discussions spanned many weeks, during which various judges presided over hearings involving restitution issues in cases other than Inouye's. This judge herself had such hearings, including a hearing in another case in which the Federal Public Defender and the same Assistant United States Attorney assigned to Inouye's case were required to address the restitution issue.

It became unclear to judges and Probation Officers exactly what the United States Attorney's position was regarding the handling of restitution when defendants could not make lump sum payments satisfying restitution obligations in full. For that reason, this judge asked the United States Attorney to provide a written statement of her general position (as opposed to her position in any particular case). The United States Attorney's response is attached to this order as Exhibit A. Again, the merits of that position are not directly in issue here, but understanding what the United States Attorney stated is likely to assist any understanding of what occurred in Inouye's

case because that statement was repeatedly referred to during Inouye's revocation proceedings.

On October 2, 2014, a meeting was held that included judges, Probation Officers, and attorneys from the Federal Public Defender's Office and the United States Attorney's Office. At the conclusion of that meeting, the judges and Probation Officers in attendance believed that the Federal Public Defender and the United States Attorney were in agreement that installment restitution payments were not illegal just because they were stated in terms of percentages of income, and that installments based on a defendant's individualized circumstances could legally be ordered.

## IV. INOUYE'S RESTITUTION CONDITION

The restitution condition imposed on Inouye by the court upon revocation provides:

> Restitution of $274,401 is due as follows: $74,401 to the Fagaragan family payable jointly and severally with codefendants John and Julie Dimitrion; and $200,000 to GMAC Mortgage. Any unpaid balance is to be paid during the period of supervision in monthly installments of 8% of the defendant's gross monthly income, commencing 30 days after the start of supervision. The Court may order that this requirement be changed from time to time as the defendant's circumstances warrant, but no Court order shall be required for the defendant's voluntary agreement to pay more than the Court-ordered amount. Interest is waived while the defendant is serving any term of imprisonment and shall begin accruing on any remaining balance, commencing 30 days

> after the start of supervision. Payments shall be made by payroll deduction, when applicable. The defendant shall notify the Probation Office of any change in the defendant's financial circumstances that affect the defendant's ability to pay. The defendant's financial circumstances shall be reviewed by the Probation Office on at least an annual basis.

It appeared to the sentencing judge at the hearing on October 30 that the Federal Public Defender and the United States Attorney were taking the position that the individualized circumstances underlying any installment schedule could not include the court's projection of Inouye's earnings or expenses. This judge views such a position as inconsistent with 18 U.S.C. § 3664.

The Assistant United States Attorney made cryptic references during the October 30 sentencing hearing to having made representations to and agreements with Inouye's attorney and to "fairness," while remarking that, with the evolution of the court's restitution policy, she might now take "a different look." If the AUSA was signaling that she was simply not in a position to disagree with Inouye given prior representations made to Inouye's counsel, the court could understand that dilemma. However, if that was the situation, it was at odds with the tenor of the AUSA's comments, which went beyond a statement that the Government was not seeking any payment schedule given a prior agreement with Inouye.

First, when the court asked the AUSA whether the Government had "a legal challenge" to the court's proposed sentence, which included a payment schedule, the AUSA answered "yes," then indicated that she objected to the proposed sentence. Presumably, the Government did not agree with Inouye that it would challenge the legality of a ruling if it viewed the ruling as clearly within the law. The Government's legal challenge therefore indicates that something more than a prior agreement is in play here.

Second, the AUSA was at pains to add her own affirmative arguments to Inouye's challenge to the propriety of the court's projection of Inouye's earnings. What the court gleaned from the AUSA's remarks was that the AUSA's view was that her objection was consistent with the United States Attorney's October 2 letter, which stated that percentages were not necessarily problematic. However, the AUSA appeared to be arguing that no percentage could be based on Inouye's future earnings or future circumstances.

## V. REASONS FOR IMPOSITION OF RESTITUTION CONDITION

### A. Scope of Objection

The parties' objection to the restitution condition is limited to the setting of a payment schedule. None of the following four matters was mentioned by either party as included in an objection.

First, neither at the original sentencing nor at the revocation sentencing was there any objection to the restitution amount of $274,401.

Second, no party contended that the revocation restitution condition involved the court's delegation of a nondelegable duty. The condition clearly provided that the court controlled the payment schedule.

Third, no party suggested that the problem was with the particular percentage the court ordered. That is, no party indicated that if only the court had ordered payments of, say, 6 percent or 5 percent of gross monthly income, rather than 8 percent, the sentence would have been permissible. Rather, the objection was with the setting of any payment schedule at all.

Fourth, no party suggested that Inouye faced immediate actual prejudice from the setting of a percentage. Because he is unemployed, any percentage will for now necessarily be a percentage of zero, meaning that he will not suffer any hardship at the moment. The restitution condition expressly contemplates that the court will lower or increase the percentage based on changes in Inouye's circumstances that he brings to the court's attention. There was no argument that court action had been anything less than prompt in reacting to information from Inouye about financial difficulties.

### B. Inouye's Financial Circumstances

Inouye is 36 years old. He has a high school diploma. He does not appear to have an ongoing substance abuse problem and appears to be in reasonably good health.

During court hearings, he is well-groomed and has a professional demeanor.

The Presentence Investigation Report prepared in 2010 notes that Inouye was steadily employed throughout his life, earning $15 an hour during periods when he was paid hourly, or between $3000 and $5000 per month when working as a loan officer.

He has been on supervised release since May 3, 2010. Although he has had some periods of unemployment during the more than four years he has been on supervised release, he has, for the most part, been employed. He has had various positions, including as a car salesperson. For much of 2014, he worked with a startup beverage business. A July 2014 report listed his after-tax income as $2197 per month. His gross monthly income was $3000. His expenses for the same period exceeded his after-tax income, totaling $2418.77, which included $1350 for rent, $400 for groceries for four individuals, $173 for electricity, $170 for telephone, $160 for commuting expenses such as gas, $100.69 for auto insurance, and $65.08 for internet.

The July report indicates that Inouye did not have medical insurance at the time but anticipated that his employer

would provide medical insurance beginning in August 2014. In June 2014, Inouye had a medical emergency that resulted in medical bills of close to $5000 that remain outstanding. Nothing in the record indicates that Inouye has paid any part of those bills, which the court noted at the October 30 hearing appeared to be an unsecured debt dischargeable in bankruptcy. The medical emergency occurred during a period in which Inouye was skipping his monthly restitution payments. Indeed, by July 2014, Inouye's Probation Officer was seeking revocation of supervised release, noting, among other things, that Inouye had been untruthful about having mailed in restitution payments. That month, Inouye's aunt submitted a payment for him representing several months' worth of installment payments. The court deferred action on the revocation petition.

Near the end of October 2014, Inouye lost his job. At that point, his three children, who had been living with him, moved in with their mother, Inouye's ex-wife. This court was not presented with any dollar figure regarding any child support obligation owed by Inouye.

Upon losing his job, Inouye moved out of the apartment he had been renting and into his aunt's home, where he is not presently being charged for rent, utilities, or food.

Inouye owes about $18,000 in back taxes and is on a payment plan under which he is supposed to pay $100 per month,

although that amount was not included in the expenses listed in July 2014. He stated at the October 30 hearing that he has made no payments on that debt for more than a year. His payment plan may reflect not only Inouye's finances but also what Inouye reported was an acknowledgment by tax officials that Inouye's back tax debt was subordinate to his restitution debt.

The court noted at the October 30 hearing that the record established that Inouye was employable and industrious. The court therefore anticipated that he was likely to find new employment within a reasonable time.

**C. Compliance with 18 U.S.C. § 3664**

Under 18 U.S.C. § 3664(f)(2), the court is required to specify "the manner in which, and the schedule according to which, the restitution is to be paid, in consideration of" the following:

> (A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;
>
> (B) projected earnings and other income of the defendant; and
>
> (C) any financial obligations of the defendant; including obligations to dependents.

A restitution order may direct only "nominal periodic payments" if the court finds "that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full

amount of a restitution order in the foreseeable future under any reasonable schedule of payments." 18 U.S.C. § 3664(f)(3)(B). This court did not make the finding that Inouye's economic circumstances did not allow the payment of any amount of the restitution order and did not allow for the payment of the full amount of the restitution order in the foreseeable future under any reasonable schedule of payments.

This court noted at the October 30 hearing that the District of Hawaii's Probation Office had years of experience observing what installment payments individuals with restitution orders were able to make. The Probation Office's experience suggested that payments of 10 percent of gross monthly income were typically feasible in the absence of extraordinary expenses. Inouye's expenses as of the date of sentencing were considerably less than were typical. This, however, did not cause the court to require Inouye to pay a percentage higher than 10 percent. Recognizing that he will likely make some contribution to his aunt once he is employed, that he has three children, and that he has other obligations, the court set the percentage at 8 percent, while standing ready to adjust that percentage if presented with additional information from Inouye warranting an adjustment.

Although the court recognized Inouye's other debts, it appears Inouye has not been making payments on those debts. In asking the court to take them into consideration, he should be

prepared to actually pay those debts, not just cite them in aid of lowering restitution payments, while continuing not to make payments to lower those other debt balances.

### D. Administrative Issues

In connection with any sentencing hearing, the sentencing judge and the assigned Probation Officer, whether a Presentence Officer for an original sentencing hearing or a Supervision Officer for a revocation proceeding, spend considerable time reviewing the record. The judge and the Probation Officer may discuss particularly thorny issues. Having invested this extensive time and effort, the sentencing judge is likely to be in a good position to project a defendant's earnings, assuming the record contains information allowing a projection. It therefore makes sense for the sentencing judge to do exactly that at the time of sentencing if the record so allows. As a matter of efficiency, if the projection turns out to be reasonably accurate, this projection eliminates the need for an additional proceeding to set a payment schedule. Of course, if the projection is off the mark, the court should adjust the schedule to match the defendant's actual circumstances.

This court is by no means suggesting that administrative convenience should trump whatever is fair, just, or sensible. But if the record allows the projection called for

by 18 U.S.C. § 3664(f)(2)(B), then there is clearly a benefit to performing that projection at the very time the judge is as thoroughly informed as possible about the defendant's employability and circumstances.

Moreover, the inclusion of a payment schedule in the sentence gives a defendant at least some idea of what to expect to pay. From a victim's point of view, a payment schedule provides an indication that payments will be monitored.

## V. THE PARTIES' OBJECTIONS

### A. Inouye's Objection

Inouye objects to the setting of a payment schedule on the ground that his future is uncertain. Inouye posits that the court should not set a schedule until the court knows what he is earning and what expenses he must pay. The court would then be able to determine what disposable income he has, and could set a payment schedule reflecting a reasonable percentage of that known disposable income.

The court is certainly willing to adjust the payment schedule to reflect Inouye's actual earnings and expenses, when those are known. But the court is unable to see why, in the meantime, it should not rely on the considerable information in the record to set a schedule. As noted earlier in this order, "projected earnings and other income of the defendant" are expressly identified in 18 U.S.C. § 3664(f)(2)(B) as factors a

court is to consider in specifying the schedule according to which restitution is to be paid.

By definition, "projected earnings" require prediction. "To project" means "[t]o calculate, estimate, or predict (something in the future), based on present data or trends." The American Heritage Dictionary of The English Language (4th ed. 2006) 1402. This court predicts that Inouye will take home in excess of $2000 per month based on what he has earned over the past several years. The court also predicts that, given his present living circumstances, his expenses will be less than they were in July 2014. In particular, his rent will be much less, so that paying 8 percent of his gross income should still allow him to meet his other obligations.

If Congress had meant to prohibit courts from using information in the record to predict what defendants would earn in the future, Congress would not have directed courts to consider "projected earnings" at all. Inouye's argument reads those words out of the restitution statute entirely. Inouye would have this court set a payment schedule based only on "continuing earnings" once a defendant is employed. Nothing in the ordinary meaning of the word "projected" suggests that this court should read "projected earnings" to mean "continuing earnings" or "ongoing earnings."

In United States v. Booth, 309 F.3d 566 (9th Cir. 2002), the defendant challenged a restitution order, arguing that, "because his circumstances do not permit any payment, he should have been required to make nominal payments only." Id. at 576. The Ninth Circuit held:

> The district court did not deviate from the statutory requirements. It recognized Booth's prior judgment obligations and his present financial difficulties, but noted that Booth had earned a living 'legally for some part of the time,' and set payments at $500 per month as an amount that Booth might reasonably look forward to being able to pay after his term of imprisonment. We find no abuse of discretion here.

Id. This court submits that the payment schedule it has imposed on Inouye is similarly consistent with the record and with § 3664.

Of course, inherent in any projection is the possibility of error. Inouye notes that it has been difficult for him in the past to make restitution payments. He points to having made restitution payments at the expense of having medical insurance, although the precise time of his medical emergency fell within a multi-month period during which he was failing to make restitution payments. His aunt ultimately made those payments for him, so his lack of medical insurance appears to have been unrelated to his restitution payments.

Inouye also points to a crisis involving one of his children. The court fully understands that financial stress can

complicate or contribute to an already difficult situation, but the record does not contain information that allows the court to conclude that the restitution schedule caused that crisis. Rather, Inouye may be arguing that the restitution schedule made it difficult for him to address that crisis once it occurred, although the court, upon learning of the crisis through Inouye's Probation Officer, promptly approved a period during which Inouye was excused from making restitution payments. In short, whenever Inouye kept his Probation Officer informed of his circumstances, the court was able to address those circumstances with alacrity. Any difficulties Inouye experienced relating to restitution coincided with his failure to keep his Probation Officer informed about his circumstances.

At the October 30 hearing, Inouye's attorney mentioned that the court had shown that it was capable of devoting substantial time to the restitution issue. Inouye's attorney therefore thought that the court could make itself available for further consideration of a restitution schedule once Inouye had obtained a new job and made more permanent living arrangements. Any judge is, of course, going to devote as much time as needed to any case. However, the considerable time spent on the restitution issue in Inouye's case reflected an attempt by the court to address not only Inouye's situation but also systemic issues. That is, the court's hope was that the investing of time

in Inouye's case would also benefit the discussion of restitution issues in other cases. It was not the court's expectation that every case involving a restitution case would involve as many hearings as Inouye's case did. The court is not saying that it will not hold as many hearings as are needed. The court is instead suggesting that numerous hearings may not always be needed.

**B. The Government's Objection**

The Government's objection is more difficult for the court to fathom than Inouye's objection, The court is accustomed to having the Government advocate for the victims' rights (including the right to full and timely restitution). See 18 U.S.C. § 3771; United States v. Kaczynski, 551 F.3d 1120, 1131 (9th Cir. 2009)(recognizing Government's obligation to attempt to obtain funds for victims seeking restitution). Inouye's victims include individual homeowners who lost more than $70,000 they could ill afford to lose.

The Government's position was that Inouye had a negative cash flow in July 2014, and that any projection had to be consistent with the July 2014 figures, which were the only detailed expense figures the court and the attorneys had. The Government repeatedly referred to the July 2014 data as the only information she had, leaving the court at a loss to understand why any projection at a sentencing hearing in October 2014 had to

ignore Inouye's actual circumstances in October. Inouye by that time was no longer paying anything at all for rent, food, or utilities. It appeared likely that, even if Inouye did begin to contribute to such expenses while living with his aunt, that contribution was unlikely to be as much as he had paid for those items in July 2014. The Government's adherence to Inouye's July expenses was tantamount to insisting that the court rely on incorrect expense information, while at the same time relying on an existing lack of employment. It is unclear why Inouye's existing lack of expenses should not be considered if his existing unemployment is considered.

The court pressed the Government at the sentencing hearing to explain when, if ever, the Government might think a court could comply with the "projected earnings" language contained in 18 U.S.C. § 3664(f)(2)(B). The very concept of projecting earnings assumes that a defendant is unemployed, as an employed defendant would not need to have earnings projected at all. The Government declined to provide even a single example.

The most the Government did was point to a situation that did not involve projected earnings at all. The situation cited by the Government involved an unemployed defendant in a different case whose sentence had included the requirement that she pay 10 percent of her gross monthly income. The Government noted that neither the Government nor the defense in that case

had objected to the 10 percent schedule. The AUSA explained that her lack of objection in that other case reflected the Government's comfort with setting a payment schedule that could be satisfied by the defendant's spouse, who, the AUSA said, "jointly controlled" property with the defendant. Section 3664(f)(2)(A) does say that a court setting a payment schedule is to consider "the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled." But this has nothing to do projecting earnings. Thus, the Government, by pointing to jointly controlled assets, was resolutely declining to cite any situation in which the Government would agree that a court could project earnings, notwithstanding the reference to "projected earnings" in § 3664(f)(2)(B).

This court can certainly envision circumstances that would afford more certainty than this case allows. A defendant whose employer promises continued employment even after a brief incarceration could probably be expected to continue to sustain prior earnings. In that situation, a court need only project continued employment and might have no need to calculate or predict future earnings. Alternatively, a defendant might be assured of a particular promotion or retirement package, again requiring only a projection of the anticipated promotion or retirement, but no calculation by the court as to the dollar

amount of earnings, which might be automatic. But such situations will clearly be rare, and the court has no reason to think Congress had these rarities in mind in enacting § 3664. The reference to "projected earnings," as opposed to "projected employment" or "projected promotion," suggests to this court that Congress expected the court to make an educated calculation of a defendant's likely future earnings. Yet, this is what the Government says the court may not do.

The court is additionally puzzled by the Government's statement at the sentencing hearing that the court should not necessarily expect wholesale Government objections to the setting of payment schedules. The Government described Inouye's case as "unusual" because it was a revocation, as opposed to an original sentencing. The Government noted that the record included numbers relating to Inouye's earnings and expenses. The court's reaction was that it was precisely those numbers that allowed the court to project Inouye's earnings and to set a payment schedule, and that such data was likelier to be available in the revocation context than at the time of an original sentencing. In short, the only thing "unusual" about this case is the Government's objection.

## VI. NOTICE TO PARTIES THAT COURT MAY CONTACT POSSIBLE AMICI

Because it is this court's understanding that, in the event of an appeal, no party will defend this court's ruling,

this court is considering contacting organizations that might file amicus briefs supporting the court's position. This had not actually occurred to the court until the Probation Office reported that the Maryland Crime Victims' Resource Center had expressed a possible interest in filing such a brief. The court is uncertain whether that office might contact related offices about this matter. If the parties in this case identify any problem with the court's pursuing the possibility of any amicus brief by contacting the Maryland Crime Victims' Resource Center, the court asks the parties to notify the court in writing no later than 7 days after any appeal in this case is filed.

**VII. CONCLUSION**

The court's setting of the restitution condition was consistent with the "projected earnings" provision in 18 U.S.C. § 3664(f)(2)(B) and with Inouye's individualized circumstances as reflected in the record. The parties' objection to the payment schedule assumes that the only consideration allowed is that of existing employment, but such a restriction reads "projected earnings" right out of the restitution statute.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, November 6, 2014.




/s/ Susan Oki Mollway
Susan Oki Mollway
Chief United States District Judge

United States of America v. Vance Inouye; Cr. No. 09-00115 SOM; Order Regarding Restitution Condition



U.S. Department of Justice

*United States Attorney*
*District of Hawaii*

*PJKK Federal Building*
*300 Ala Moana Blvd., Room 6-100*
*Honolulu, Hawaii 96850*

*(808)541-2850*
*FAX (808) 541-2958*

October 2, 2014

The Honorable Susan Oki Mollway
Chief Judge of the United States District Court
for the District of Hawaii
300 Ala Moana Boulevard
Honolulu, Hawaii 96850

Re: Judgments Ordering Restitution Payments

Dear Chief Judge Mollway:

I received your request for a letter stating the prosecution's position in regard to judgments directing criminal defendants to pay restitution according to a schedule. As you are aware, a memorandum from Deputy Chief Probation Officer Jonathan K. Skedeleski dated September 12, 2014, generally outlined discussions among my office, his office, and Federal Public Defender Peter C. Wolff, Jr., up to that time, after Mr. Wolff's letter to you dated July 30, 2014.

As Mr. Skedeleski's memorandum states, those discussions resulted in a general resolution of most of Mr. Wolff's points except one. That one point was a proposal that where restitution is ordered, as to the restitution payment schedule, the judgment should reflect "[a] fixed percentage amount based on an individualized assessment of the defendant's financial condition and should set forth an amount that the defendant is actually required to pay, while allowing but not requiring the defendant to make voluntary overpayments."

We did not, and still do not, have any opposition to imposition of a fixed percentage amount of payment, as long as it is "based on an individualized assessment of the defendant's financial condition," as the law requires. *Ward v. Chavez*, 678 F.3d 1042, 1050 (9th Cir. 2012) ("[f]or a restitution order to be lawful, ... § 3664 requires that the district court set a schedule in consideration of the defendant's financial resources."). The determination of the percentage of repayment, if any, must be made by the district court, not delegated to another entity. *United States v. Gunning*, 401 F.3d 1145, 1150 (9th Cir. 2005).

We understand that Probation, which had proposed a fixed percentage of ten percent, has subsequently changed the amount to $25 or ten percent, whichever is greater. We have the same position in regard to the addition of the $25 provision: as long as it is based on a judge's individualized assessment of the defendant's financial condition, we will not have any opposition

EXHIBIT A

to it. What we cannot promise is that in every case, we will agree with the imposition of $25 or a fixed percentage, or that the percentage will always be the ten percent suggested in discussions with Probation, since each case is necessarily based on individual factual determinations. In a given case, for example, the prosecution may contend that the percentage be more than ten percent or that the defendant's financial condition did not support a capacity to pay as much as ten percent.

I hope this clarifies our position. If you need further information, please do not hesitate to contact me.

Very truly yours,

FLORENCE T. NAKAKUNI
United States Attorney
District of Hawaii

cc: Peter C. Wolff, Jr.
Jonathan K. Skedeleski